# EXHIBIT #2

**AFFIDAVIT**

**STATE OF ILLINOIS** **:**

**:**    Case No.:  12-C-6007

**CITY OF CHICAGO** **:**

I, Larry Boss, make the following statement freely and voluntarily.  I understand that this statement may be used in evidence:

1.  In May, 2007, after Ms. Ladias had reprimanded me for leaving an audit review early, I learned that another employee and Ms. Ladias had left reviews early. (*See*  Dkt. #42, ID  #844; Hearing Transcript ("HT") (Exh. 8 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment),[1] pp. 56, 408).

2.  Ms. Ladias also imposed upon me a schedule for closing open grants, but did not impose such a schedule on two of my colleagues, who also had open grants. (*See* Dkt. #42, ID #845; Exh. 8, pp. 73-75, 172-177).

3.  Close-outs of open accounts only became an issue in 2007—even though some programs had been open since 1998—only after I had filed a complaint against Ms. Ladias.  (*See* Dkt. #842, ID #845).

4.  Ms. Ladias concomitantly attacked me for not responding to a letter that, as it turned out, she had never written.  (*See Id.*, ID #847) (citations omitted).

5.  Ms. Ladias also criticized me for having failed to process a letter, which she claimed existed, but which she was unable to produce.  (*See Id.*, ID #848)

---

[1] Hereafter, references to Exhibits to Plaintiff's Opposition to Defendant's Motion for Summary Judgment will be listed as "Exh. 2," "Exh. 3," "Exh. 4," etc.

6.  On December 3, 2007, at my appraisal review, Ms. Ladias ranked me "Fully Successful," one level lower than the Highly Successful rating that I had received for the past four years in a row.  (Exh. 44).

7.  Ms. Ladias further informed me that my level of performance was "unacceptable," in view of outstanding close-outs.  (Exh. 39).

8.  Yet, as of the date of the performance review, I had closed 13 programs.  (*See* Dkt. #42, ID #849; *see also* Exh. 51).

9.  Ms. Ladias admitted to speaking to my co-worker, Larry Kobb, concerning my EEO case, and told Mr. Kobb "you guys are talking very loud and shouldn't be discussing the EEO case.  I heard you laughing."  (Exh. 8, pp. 501, 503; Dkt. #42, ID #849).

10. Mr. Kobb told me that Ms. Ladias had asked him questions about my complaint, and had told him not to get involved in the complaint.  (*Id.*).  Subsequently, when an EEO investigator sent Mr. Kobb an affidavit request, Mr. Kobb responded:  "I do not wish to provide a response to this affidavit.  I don't have all of the facts in this case and don't want to get involved shortly before my retirement this year."  (Dkt. #42, ID #849; *see also* Exh. 54).

11. The AJ noted that, after Ms. Ladias spoke with Mr. Kobb, "he refused to participate in the EEO process."  (Dkt. #42, ID #855).

12. Judith Hartfield, a co-worker, was likewise intimidated by Ms.Ladias.   After Ms. Ladias had seen Ms. Hartfield speaking to me, Ms. Ladias instructed her not to "associate with troublemakers."  (Exh. 8, par. 216).  The AJ, Administrative Judge Deborah Powers, commented that, after Ms. Hartfield's discussions with Ms.

2

Ladias, Ms. Hartfield became fearful about participating in the EEO process.  Dkt. #42, ID #855.

13. Administrative Judge Powers noted that Ms. Ladias had spoken to Defendant's Discrimination Complaints Manager, Michael Hubbard, in early August, 2007. (Dkt. #42, ID #851).  AJ Powers found that:  "Despite the fact that Complainant had not had any significant problems in the past, suddenly there was an explosion of e-mails over a period of four months regarding complainant's allegedly poor performance, the first one concerning a meeting held on August 20, 2007; only a week or so after Ladias found out about the EEO complaint." (*Id.* #852).  AJ Powers further found that "[m]any of these e-mails contained unsubstantiated allegations, and some outright misrepresentations."  (*Id.*).

14.  In the same vein, AJ Powers held that "Ladias was quick to make a paper trail of alleged problems on projects for which Complainant was not responsible." (*Id.*).

15. Ms. Ladias, *inter alia*, accused me of not closing out a project for which another employee had been responsible.  (*See Id.*).

16. On August 20, 2007, only a few weeks after Ms. Ladias discovered that I had filed an EEO against her, closure of the grants became top priority; and I was called into a meeting, at which time I was informed I had two months to close all grants.  (*See Id.*, ID #853).

17. Ms. Ladias subsequently complained to me that she had not received any close-outs, at a point in which I had closed nine grants.  (*See Id.*, ID ##853-854).

18. Although other engineers in my unit had not closed all their grants, I was the only employee who was placed on a schedule. (*See Id.*, ID #854).

19. After AJ Powers had ordered Defendant to upgrade my evaluation for 2007, Defendant retaliated by downgrading me for the next four years. Defendant downgraded performance evaluations that I received in 2008, 2009, and 2010.

20. In seeking to justify the reduced rating, during these years, Defendant relied upon the same criteria concerning close-outs, which AJ Powers concluded that Defendant had not applied to other employees: to wit, the purported failure to close out open accounts.

21. I also did not receive any bonus money from HUD in 2008, 2009, or 2010, based upon my annual evaluations. In each of these years, I received a "Fully Successful."

22. Prior to, during, and subsequent to, the time of the hearing of my first EEO case, the harassment to which I was subjected from Ms. Ladias and Ms. Ladias' supervisor, Steven Meiss, continued unabated.

23. Ms. Ladias further retaliated when, from July 14, 2008 to October 23, 2008, she placed me on a Performance Improvement Plan ("PIP"). Ms. Ladias claimed that she had placed me on the PIP because of outstanding work assignments: specifically, the Capital Fund Program ("CFP") 2002 Closeout list generated by Sylvia Garcia. (This list is sometimes referred to as the Pre-2003 List). In addition, Izella Harvey, an HR employee whose testimony was completely disregarded in the decision by AJ Powers, sent Ms. Ladias an email in which she appeared to suggest that Ms. Ladias could downgrade my performance, and

4

subsequently put me on a PIP. This email traffic between Ms. Ladias and Ms. Harvey was informed by their knowledge that I had a pending EEO complaint. The implication that must be drawn from this email traffic is that this PIP scheme was deliberately formulated immediately after Ms. Ladias and Ms. Harvey had learned that I had filed an EEO action.

24. I had completed this list on or about June 30, 2008. Ms. Ladias then handed me the PIP document on June 30, 2008. The document was not complete and contained information that was incorrect and missing: specifically, the assertion that the Pre-2003 CFP Grants List, which she claims was outstanding or late, needed closing.

25. The PIP assignments involved closing out the grant programs on that 2003 CFP list (The closing of 2003 CFP grants were not considered late or outstanding until after September, 2008, according to 24 CFR 905 as well as Ms. Ladias' deposition (Exh. 10) (p. 66: lns. 11-15). It takes a total of five years or less to close out a grant). Thus, at the time Ms. Ladias gave me this PIP, this so- called outstanding 2003 CFP List did not exist, and was not included in the PIP document. Ms. Ladias eventually, after requesting it in various emails, had someone generate this list, and handed it to me on July14, 2008. Therefore, the reality of the situation was this: There were no problems regarding the closure of my CFP grants, when Ms. Ladias generated this PIP Document. The Pre-2003 CFP List was completed, and the 2003 CFP Closure List was not considered outstanding or late – the Housing Authorities had until September 2008 to close

5

out these grants.  Ms. Ladias did not verify or confirm the allegations she made in that PIP.  They are all baseless.

26. Ms. Ladias continued to claim falsely that I was the only Facility Manager ("FM") who had outstanding open grants.

27. Ms.. Ladias continued to give me unrealistic target dates (October 31, 2007 and January 18, 2008).

28. Yet, Mr. Kobb's grants, and the grants of another engineer, William Spearman, which were from 2002, were still open in May and June, 2008.

29.  I subsequently discovered, *inter alia*, that the Chicago Housing Authority ("CHA"), for which Mr. Kobb had been responsible, had 23 open grants.

30.  Although I was responsible for the CHA Existing Maintenance Issues: Inspections -both HQS and REAC and maintenance issues/complaint, the work involving Modernization (Capital Funding ("CF")) and various other associated grant programs) was all handled by Larry Kobb; and he was the employee designated as the FM go-to person for those concerns (as delineated on the assignment sheet and documented in the PIC database).

31. I was the only FM placed on a PIP with respect to the close-outs of the CFP 2002 Close-Out List generated by Sylvia Garcia.

32.  Ms. Ladias falsely claimed that Mr. Kobb had completed all of his close-outs with his HAs when he retired.

33. Another Agency employee, Pete Panagos, also left Housing Authorities with open programs, which needed closing, when he retired.  Mr. Panagos' programs

6

had remained open, because he did not have access to the Line of Credit Control System ("LOCCS"); even though such access was a requirement of the job.

34. Both Mr. Panagos and Mr. Kobb are Caucasian males, and Ms. Ladias held them to a different standard than that which she applied to me.

35. Ms. Ladias also, in addition to never having placed Mr. Kobb or Mr. Spearman on a PIP, never gave either of them deadline dates to close out open programs. Neither of them had ever engaged in protected activity, and Mr. Kobb, again, was a Caucasian male.

36. I was also excluded from a meeting, held on March, 2009, to discuss open grants with the CHA. Ms. Ladias asked Mr. Spearman, who had never engaged in protected activity, to attend instead.

37. In August, 2007, Ms. Ladias gave me an unscheduled performance review, and an unsatisfactory job appraisal.

38. Again, on June 30, 2008, I had completed my Pre-2003 Open CF List (generated by Silvia Garcia) and documented this fact in emails to Ms. Ladias. (*See* Email exchange, dated July 3, 2008 to July 14, 2008) (attached as Exhibit 41))**.** Ms. Ladias nonetheless placed me on a PIP. Because I had completed my Pre-2003 Open CF List, there was no basis for the PIP. Ms. Ladias decided that the PIP exercises would involve the closing of the 2003 CF List, with grants that were technically not overdue /outstanding. (*See* PIP (Exhibit 39)), in that it was not due until after September 2008. (*See* Exh. 37; and Deposition of Ms. Ladias, dated March 6, 2013 (Exh. 15), p. 66, ln. 11). It would appear that Ms. Ladias did not know this. At the time that she put me on the PIP (June 30, 2008), she appears

7

to have failed to check to see if I had indeed completed this list. (*See* Email from Ms. Ladias to me, dated August 27, 2008, and attached list (which are attached as Exh. 42); *see also* Email exchange between Ms. Ladias and me, dated August 28, 2008 and August 29, 2009 , and attached list (Exh. 43); *compare with* Exh. 40, p. 2 (in which Ms. Ladias stated:  "You need to close-out all outstanding CFP grants from FY 2003 and earlier to demonstrate the Marginally Successful performance."  (Exh. 40, p. 2)).  Moreover, Ms. Ladias did not have the 2003 List, to which she referred in the PIP, available either.

39. Moreover, the PIP document contained information that was totally erroneous.  For example, Ms. Ladias referenced two Hope 6 documents, which she claimed I had failed to close, but which were performed by, and which were the responsibility of, Larry Kobb.  (It would thus appear that Ms. Ms.Ladias was simply following instructions from Human Resources to continue the acts of reprisal by putting me on a PIP, even though the evidence did not support my being on one).  It is also noteworthy that Ms. Ladias and HR were planning the PIP during November, 2007 (*see* Email exchange between Ms. Ladias and Ms. Harvey, dated November 16, 2007) (Exhibit 7)), a point in time in which, as held by AJ Powers, my evaluation was changed from "Fully Successful" to "Highly Successful."  (Dkt. #42, ID #858).

40. Again, on June 30, 2008, I had completed my Pre-2003 Open CF List (generated by Silvia Garcia) and documented this fact in emails to Ms. Ladias.  (*See* Exh. 41).  On October 23, 2008, I completed the PIP exercises, which involved the closing of my CFP Grants for FY 2003—which were, according to regulations,

and even according to Ms. Ladias: not due until after September, 2008. (*See* Exh. 37; and Deposition of Ms. Ladias, dated March 6, 2013 (Exh. 15), p. 66, ln. 11).

41. While I was still on the PIP, Ms. Ladias assigned me a review on short notice, and appeared to be unnecessarily overburdening me with additional work: the addition of two of the largest housing authorities in Illinois: Cook County and the CHA CFP FM work of Mr. Kobb (assigned without my knowledge). I was also performing some of the FM functions on Mr. Kobb's HAs, after he had retired. (*See* Email from me to Ms. Ladias, dated August 29, 2008 (which is included in Exh. 43)). Initially, Ms. Ladias told me that I was to replace another employee, who was scheduled, in January 2008, to perform the CHA Hope 6 review. Customarily, when someone has a scheduling conflict, the review is re-scheduled or postponed to accommodate that individual. (This would have been an easy task, in that CHA is within walking distance of the HUD office). However, Ms. Ladias failed to act in accordance with custom here. (*See Id.*). It would thus appear that, while on the PIP and performing PIP exercises, I was strategically selected to perform this review, along with these other unscheduled activities, with the sole intent of making me fail the PIP, so that I could be terminated. The emails exchanges between Human Resources and Ms. Ladias are highly suggestive and imply just this. (*See* Email exchanges between Ms. Ladias and Ms. Harvey, dated November 16, 2007) (Exh. 40)). Moreover, although Ms. Ladias and Ms. Harvey did not succeed in terminating me, the combination of the PIP and the other work that Ms. Ladias added to my workload caused

9

considerable stress, and caused my health to deteriorate. I thus suffered a stroke not long afterward.

42. During the time of the review, while I was still on the PIP, September 15, 2008, my physician ordered me to take an immediate CT scan, and the order was justified, given that I eventually had an operation. I also had a history of chronic abdominal pain. My physician's diagnosis attributed much of my discomfort to my diabetic medicine. However, after several episodes of tests and misdiagnoses, and suffering weeks of pain, I developed, in November or December, 2010, a lump on my right side abdominal area: a result of a tear in my abdominal wall. An MRI revealed several abdominal tears: an Inguinal Hernia. I was operated on in April, 2011. Ms. Ladias nevertheless put me on AWOL for September 15, 2008 and September 16, 2008, and demanded that I submit a physician's statement. However, she appears to have been hoping that I would not provide such a statement, since she ultimately did not accept my physician's carefully written Certification.

43. With respect to Ms. Ladias' placing me on AWOL, although I met every one of Ms. Ladias' demands, with respect to submissions, she remained unrelenting. She appears to have sought to undermine me further, and to increase my frustration, in that she rejected everything that I submitted.

44. With respect to the CHA review, Ms. Ladias knew that I would be out for the first day, and she did not provide me with the option of performing the review on the remaining days. Further, because I had expected Ms. Ladias to change the date,

10

and she had not, I did not believe that I would be allowed to attend the review on a partial basis.

45. At the time that Mr. Meiss threatened me with AWOL, purportedly for leaving 45 minutes early, I had worked extra hours the previous day. Working in this manner, under Ms. Ladias' supervision, had been a standard practice before. However, it suddenly became an issue, with respect to me.

46. Mr. Meiss and Ms. Ladias were far worse abusers, and they never punished themselves. I also informed Mr. Meiss that I would be providing a doctor's certification.

47. I could not work on September 15, 2008, because of the doctor's order. (*See* note from Daniel Sisbarro, M.D., dated October 14, 2008) (Exh. 3)). However, Tuesday, September 16, 2008 was my normal telework day. The physician's assistant, who filled out the form, and later had the physician sign it, assumed that I would be off on September 15, 2008 and September 16, 2008, since I told her that I would return to work on September 17. (*See* Email from me to Ms. Ladias, dated October 15, 2008 (which is included in Exh. 24)). This misunderstanding was subsequently addressed in an email, (*id.*), which Ms. Ladias rejected (*See* Email from Ms. Ladias to me, dated October 21, 2008 (which is included in Exh. 24); *see also* Email from Ms. Ladias to Ms. Harvey, dated October 17, 2008 (which is included in Exh. 45)). My physician subsequently sent a personal letter to Ms. Ladias, according to her specifications (*see* Letter from Daniel Sisbarro, M.D., dated August 25, 2008 (Exh. 47)), which she likewise rejected. (*See* Email from Ms. Ladias to me, dated October 21,

11

2008 (which is included in Exh. 24)). She also ignored my documentation with respect to the work that I had performed while I had teleworked.

48. My doctor's certificate explained that I had a CT scan. Contrary to what my physician had advised, Ms. Ladias incorrectly claimed that I could take the CT scan at any time.

49. Based on the emails sent between Ms. Ladias and HR specialist Harvey, Ms. Ladias suggested that the AWOL charge should stand. (*See* Email from Ms. Ladias to Ms. Harvey, dated October 17, 2008; and Email exchange between Ms. Ladias and me, dated October 3, 2008 to October 15, 2008 (all of which are attached as Exh. 45)). Also, according to the criteria delineated by Ms. Harvey, I should never have received an Official Reprimand, because Tuesday was my approved Telework Day. (*See* Email from Ms. Harvey to Ms. Ladias, dated September 24, 2008 (Exh. 46)).

50. Ms. Ladias wrote me that I would be charged with AWOL for having taken my CT scan, that she did not believe that my doctor's certification justified my absence, and that the certification "exacerbates the entire situation."

51. I had worked extremely late on September 17, 2008, prior to being charged for AWOL for 45 minutes, on September 18, 2008, by Mr. Meiss.

52. Mr. Meiss was being inconsistent, in charging me with AWOL, given the short time of my absence, given my work beyond my scheduled hours the day before, and given Defendant's willingness to allow other employees to leave early willy-nilly. None of these employees ever had to fill out a leave or comp-time request. In two typical instances, Neither Mr. Meiss nor Ms. Ladias ever placed Mr. Kobb,

who is Caucasian and who had never filed an EEO complaint, on AWOL, even though Mr. Kobb routinely left 20 minutes early each day to catch a train. *Id.* at par. 53. Mr. Meiss and Ms. Ladias also never placed David McMullin, who is Caucasian and who had never filed an EEO complaint, on AWOL, even though Mr. Mullin routinely worked out in the exercise room for 45 minutes to an hour during working hours after lunch every day.

53. When I asked to be allowed to fill out a leave request for September 18, 2008, Ms. Ladias had already entered AWOL into the system. Ms. Ladias failed to explain why she could not change this, a mere four days later.

54. With respect to a purportedly "mandatory" meeting, Ms. Ladias initially sent an email to the financial staff and then forwarded the email to other staff members and me. Nowhere in the message of the email did it state that this meeting was "mandatory" or that employees must attend, as was customarily done for meetings that all employees were required to attend. In contrast, Ms. Ladias called a mandatory meeting on April 7, 2009, my telework day. I observed that Ms. Ladias had approved the absences of some individuals, who, to my knowledge, had not filed EEO complaints. Ms. Ladias has an obvious bias against me, based upon my EEO activity, and held me to a different standard.

55. The overwhelming work on CHA was Mr. Kobb's, and his other workload was less than that of other employees, given the large size of the CHA. Ms. Ladias also failed to inform me that, with all of my other assignments, the entire CHA would fall on my shoulders.

13

56. On August 26, 2008, Ms. Ladias sent to her staff the 2008 HA Assignment List (*see* Affidavit B, pp. 71 & 72) (Exh. 19)), as she normally does each year. However, the 2008 List was a combined list that included the FM, FA, and PHRS staff. This list is posted on the web. In the email, Ms. Ladias stated that "all of Larry Kobb's HR assignments (except for two HAs) went to the financial staff. Bill Spearman was assigned Peoria HA and Larry Boss was assigned Cook County HA with the FAs receiving the rest of the HAs." Ms. Ladias' practice had been to notify employees, if there were a change in an HA assignment, as she did in this instance. However, there is no mention of Mr. Kobb's CHA FM (modernization/CFP (*see* the 2007 HA Assignment List) (Affidavit A, p. 85) (Exhibit 20)), with respect to work that was being transferred to me. My necessary assumption was that Mr. Kobb's CHA work went to the FA staff, as Ms. Ladias stated. Then, on September 5, 2008, Ms. Ladias made additional changes to this 2008 list (*see* Group email from Eleny Ladias, dated September 5, 2008) (which is included in Exhibit 21); *see*, especially, ***readable*** version of Group email from Eleny Ladias, dated September 5, 2008) (which is included in Exhibit 22)). I would be assigned to the Waukegan HA, and Mr. Spearman would be assigned to the Winnebago HA. (*See* Exhs. 21 & 22)). Again, there was no mention of Mr. Kobb's CHA FM (modernization/CFP) work's being transferred to me. To be sure, Mr. Kobb and I had shared the FM work associated with the CHA. Moreover, the work assignments are clearly specified and delineated on the 2007 HA assignment List. Thus, despite what Ms. Ladias has stated, Mr. Kobb handled the CFP issues, including the reporting in LOCCS, and the closing

14

out of grants. This fact is also confirmed on the Defendant's open CF list. (*See* Exhibit 23 & Defendant's EX.7, p.001, p.B001, & p.B009). Further, it was not in Ms. Ladias' interest to inform me, at that particular time, in view of my EEO activity, that she had assigned me to be the lone FM handling the CHA. It is thus, again, clear that Ms. Ladias was attempting to characterize me as lazy and incompetent, for the benefit of the EEO Administrative Judge. Ms. Ladias also initially hid the CHA assignment from me, because she did not want me to know about the CFP chaos at the CHA, in which HUD headquarters (HQ) was pressuring PIH to get CHA to start reporting in LOCCS; and to start closing all open grants per the CFR. Ms. Ladias' actions accordingly demonstrate disparate treatment of Mr. Kobb and me. She falsely attacked me, asserting that I had failed to close out grants, but she had covered up for Mr. Kobb, who had failed to close out grants. Later, when I was in a position to witness the latiude that Ms Ladias gave Mr. Kobb, with respect to CHA, Ms. Ladias realized that this was a potential mistake, and she appears, at this point, purposely to have isolated me from this CHA debacle. She therefore had Mr. Spearman help Cheryl Evans-Peterson interface with the CHA to correct the situation. Before Mr. Spearman became involved, Ms. Evans-Peterson was coming to me with respect to some of the CFP issues the CHA had. Then, I began to send emails to Ms. Ladias to induce her to clarify just what my role was with respect to the CHA. (*See* Email from me to Ms. Ladias, dated December 29, 2008; and Email from me to Ms. Ladias, *et al.*, dated April 1, 2009) (both of which are included in Exh. 21)). At that point, Ms. Ladias instructed Mr. Spearman to help Ms. Evans-Peterson.

15

Because the circumstances seemed suspect, I decided to begin investigating. The timeline of the events, as demonstrated in attached emails (*see* Exhibits 21 and 22), is as follows:

December 29, 2008 – I sent Ms. Ladias an email requesting clarification on what my role was to be, with respect to the CHA (*see* Email from me to Ms. Ladias, dated December 29, 2008) (which is included in Exhibits 21 & 22)), because I was spending a considerable amount of time helping Ms. Evans-Peterson concerning some CHA LOCCS issues:  far too much, from my perspective.  Also, Ms. Evans-Peterson had informed me during this time that I was listed as the FM contact on this 2008 list.  I was extremely surprised.

January 5, 2009 – Ms. Ladias responded, and sent me an email, stating that she would get back to me regarding this question sometime that week (*see* Email from Ms. Ladias to me, dated January 5, 2009) (which is included in Exhibits 21 & 22)).  **She never did**. Meanwhile, questions regarding the CHA(LOCCS) abruptly stopped.

January 28-29, 2009 - The EEOC hearings were concomitantly conducted.  (*See* Dkt. #42, ID #842).  I was caught up in this process, so I did not, at the time, pursue the CHA issue.  Also, I knew that Ms. Evans-Peterson and Mr. Spearman were meeting with, and training, the CHA staff, so I presumed that Ms. Ladias had corrected the situation and had made Mr. Spearman the FM for the CHA.

16

March 31, and April 1,2009 -Ms. Ladias sent an email regarding updating EPC information for the CHA. (*See* Emails from Ms. Ladias to me, dated March 31, 2009 and April 1, 2009) (which are included in Exhibits 21 & 22). I saw my name listed as the FM contact, so I again asked Ms. Ladias the same question. (*See* Group email from me, dated April 2, 2009) (which is included in Exhibits 21 & 22)).

April 2, 2009 - Ms. Ladias, for the first time, admitted to me that she had assigned me, and only me, to be the FM for the CHA back in August 26, 2008. (*See* Email from Ms. Ladias to me, dated April 2, 2009) (which is included in Exhibits 21 & 22)). Also, Ms. Ladias appeared to be disturbed by my questioning her, and stated in that email: "I will not entertain further discussion on this via email." (*Id.*). In fact, Ms. Ladias never informed me of this change, as is customarily done (at least, she had not done so until April 2, 2009). In view of her unusual lack of communication with respect to this assignment, as well as the timing, I concluded that her motive, in not informing me that Mr. Kobb's CHA work was being transferred to me, was both to dissimulate during the EEO process, and to retaliate against me, because of my EEO activity.

57. With respect to a conference call, to be held on April 7, 2009, in which all teleworking days were purportedly to be cancelled, Mr. Meiss appears to have allowed other employees, who were teleworking, to be absent; because said employees were absent.

58. I was the only employee affected; as Ms. Ladias well knew. Ms. Ladias also stated (*see* Defendant's Exh. 24) : " Please rearrange your work schedules and

17

inform me of your schedule change. There are no exceptions." Yet, on another occasion in which attendance was required, Ms. Ladias appears to have approved the absences of Mr. Spearman, Siska, and Freeman so there were exceptions. Ms. Ladias therefore demonstrated disparate treatment, when she improperly admonished me for not attending a teleconference meeting (which, as has been noted above (*see* Par. 54), Ms. Ladias had not even made clear was mandatory).

59. Ms. Ladias told me that I "really do not have a case" during PIP meetings in 2008. I recall a meeting that took place, after I had learned that Ms. Ladias assigned me the CHA work (April or May 2009 ) at which Ms. Ladias made these comments.

60. There was no stipulation in the telework agreement with HUD with respect to the Line of Credit Control System ("LOCCS"). Ms. Ladias was never able to produce a copy of the telework agreement, with any such stipulation. Further, other employees worked at home without access to LOCCS.

61. Defendant's Exh. 27 is an attachment from Ms. Ladias to her staff, not an email directly from the IT Department. This email was not addressed to her, and there is no evidence that she ever took this training. Nor is it clear just how she received the attachment. Rather, it is an email from the IT specialist, Ms. Galloza, thanking some individuals who attended Hudmobile training and instructing those who did not attend on how to obtain the training, and how to hook-up on Hudmobile. This IT email does not say anything about Hudmobile's being mandatory, or that it is a mandatory requirement for Telework use. In

Defendant's Exh. 28, which is an email from Ms. Ladias, Ms. Ladias has again made a statement that is not true:  An employee can, in fact, work properly from the employee's home, as long as the employee possesses a HUD-issued laptop (notebook).  (*See* ROI, Affidavit B, "Telework Program Policy,"  p.112 &113) (Exh. 24)).  Ms. Ladias has also listed a web address, and appears to imply that this enables an employee to connect from home.  This is not true.  According to the IT Specialist letter in Defendant's Exh. 27, there are some additional steps required for use on an employee's home computer, including the downloading of the Citrix Client software.   IT surely controls this software, as is stated in the Telework Policy.  Additionally, There are some specific requirements with respect to work from an employee's personal computer (from Telework Policy: high speed/ internet access & computer), before IT approves the equipment's use for telecommuting.  According to this, Hudmobile will be limited:  that is, many telecommuters do not have high speed ISP (Internet Service Provider).  Clearly, Ms. Ladias did not take this Hudmobile training.  Nor did she read the HUD Telework Program Policy, and she most likely does not understand it.  Her motivation in writing this has nothing to do with HUD business, and I believe that she was motivated by her animus towards me, and my EEO Complaint.  I also Goggled Citrix Web Client, which states:  "Citrix is an online tool installed and configured on a server that allows multiple users to access and share installed applications directly from the Web."  Hence, this is another one of Ms. Ladias' many harassing tactics, based on rules and directives that she appears to make up, as she goes along.  An employee cannot download and load Hudmobile

19

software, unless the IT Department authorizes or approves it.  Also, I had a HUD-issued Laptop that I used at work and when I teleworked.  This laptop has all the software that I need on it. Therefore, there was no need for me to have this Hudmobile software.  Again, Ms. Ladias, in her deposition, on January 12, 2011 (Exh. 10) (p. 150, lns. 4-19)) stated, with respect to telework:  "The requirement is that if a HUD employee is going to tele-work, they have to have access to all HUD systems.  So if you don't take your HUD laptop home and you are working off your personal computer, then you need to have access to HUD Mobile." Question (Fuchs): "where is that required?" Ladias:  " In the tele-work agreement."  (Mr. Fuchs then showed her the Telework Agreement and asked her to identify where it states this.  She then claimed that it was not complete and that they (Ms. Ladias & HUD's counsel) would submit a complete one. However, they never did this.  Rather, on February 15, 2011, Defendant submitted some irrelevant outdated (2003) telework documents, at which point Hudmobile did not exist.  I looked at the agreement that Ms. Ladias submitted in the ROI, and I did not see it.  It is doubtful that it exists, unless there is a new version of the telework agreement that includes it.  Moreover, the IT Department has Administrative Control over all telework connectivity to HUD systems, including Hudmobile, and the IT Department issued, and always maintained ultimate control over, the programs on my Laptop, as is delineated in the Telework Program Policy.  Therefore, the IT Department  approves where this software is installed.  Ms. Ladias does not.  The IT Department provided the software on my laptop to access the necessary HUD systems, and I submitted

proof of this. (*See* emails from me to Ms. Ladias, dated September 9, 2009) (which are included in Exh. 25)). It is thus apparent to me that Ms. Ladias continued to make baseless demands as part of her harassment campaign. Yet, she failed to submit documents that substantiate her assertion that Hudmobile is required for telework. Further, because of Ms. Ladias' discriminatory and retaliatory behavior, she had tried, on many occasions, to undermine me, and strip me of my telework privileges. I believe that Ms. Ladias' attempt had not been successful in this instance, in that Izella Harvey, of Human Resources, suggested that Ms. Ladias check with IT, with respect to my clarification, to determine if I indeed had access to HUD systems when teleworking. (*See* email exchange between Ms. Harvey and Ms. Ladias, dated September 15, 2009) (which is included in Exhibit 25)). I believe that they investigated, and that IT confirmed that what I had explained was true. (*See* Exh. 25). It would appear that. Ms. Ladias and Ms. Harvey had been plotting for months, in trying to figure out how they could take my telework days away. (*See* email from Ms. Harvey to Ms. Ladias, dated July 22, 2009) (which is included in Exh. 25)). I therefore believe that the IT Department educated Ms. Ladias about my laptop, connectivity, and Hudmobile, because the harassment regarding the threat to take away my telework ceased. There was no action, after Ms. Harvey's email of September 9, 2009. (*See* Letter from Ms. Harvey to Ms. Ladias, dated September 15, 2009 (which is included in Exh. 25)). The following timeline will further clarify the falseness of Defendant's assertions in paragraph 41. As background, as Ms. Ladias was well aware, I was out on sick leave,

21

because of my stroke, from July 9, 2009 to September 2, 2009.

July 22, 2009 – Ms.  Harvey sent Ms. Ladias a Telework Cancellation template to complete for me.  (*See* Exhibit 25).

September 14, 2009 – Ms. Ladias sent a harassing email, claiming that I did not have access to HUD systems when I teleworked; that I must obtain Hudmobile; and that I could not  telework until I were to demonstrate that I had access .  (These are all fabricated requirements).

September 14, 2009 – I responded with proof from the IT Department:  a work order showing connectivity upgraded by IT on my laptop.  (*See*  Exhibit 25).  I had been having trouble connecting from home with existing connectivity software).

September 14, 2009 – Ms. Ladias responded by declaring that I must have my laptop with me at all times, I must obtain Hudmobile, or my telework privileges would be terminated. (*See* Exh. 25).   She also sent an email to Ms. Harvey.  (*See Id.*).

September 15, 2009 – Ms. Harvey sent Ms. Ladias an email, suggesting that Ms. Ladias verify the information that I sent, with respect to the IT Dept.

September 23, 2009 – The EEOC Decision was issued.

October, 2009 – I was transferred to the supervision of Elmore Richardson.

62. Access to Line of Credit Control System ("LOCCS") was never enforced, and some employees, such as Pete Penagos, never were able to access LOCCS, even when they were not working from home.

63. When Ms. Ladias demanded that I obtain access to HUDMobile software, in order to work at home using LOCCS, she made this demand disparately, with respect to me. No other employee, working from home, was directed to do this.

64. On September 14, 2009, I informed Ms. Ladias, prior to teleworking, and as was required, what my work plans were, before I teleworked that day.

65. When Ms. Ladias demanded that I have my laptop with me when I teleworked, even when I was working on an assignment that did not require me to have a laptop, she was treating me in a manner disparate from that in which she treated other employees.

66. On October 11, 2009, after the AJ's decision, when HUD transferred me to the supervision of Elmore Richardson, there were other supervisors available at the HUD Chicago office, who actually supervised Engineers; and there were engineering job positions available. In contrast, Mr. Richardson is not an Engineer or Facilities Manager, and has no experience supervising them. Further, although Mr. Richardson was not a named Responsible Management Official in my previous EEO Complaint, he was, as Ms. Ladias' email reveals, cooperating with her in notifying her of my probable EEO activity. (*See* Exh. 36).

67. Although Mr. Richardson was ostensibly my supervisor, Ms. Ladias directed my workload, and attended a meeting with Mr. Richardson and me, in which my work was discussed.

68. Mr. Richardson allowed Ms. Ladias to edit my letters. Mr. Richardson admitted that he did not sign one of my letters, and that he "might" have asked Ms. Ladias

23

about the letter.  In this particular instance, I had caught him red-handed, coming out of Ms. Ladias' office with the letter.

69. Mr. Richardson deferred to Ms. Ladias in general concerning me, and, as has been noted above, even included her in a meeting, to discuss my work. He has allowed both Ms. Ladias and Mr. Meiss to dictate my assignments.

70. Under Mr. Richardson's supervision, my workload did not decrease.  It increased instead.  During that time period, only one (1) of my assigned projects was taken away:  EH&S. On the other hand, I received six (6) new assigned projects, and, in fact, seven (7), if the reassignment of the CHA  to me is included as well.  I note the following assigned projects:

1.) Environmentals (Added):  In October or December 2009, Ms. Ladias distributed this responsibility to the Engineers/FMs.  This was previously performed by Leigh Schrock, and then was co-ordinated by Ted Termunde & Shirley Wong and subsequently became the engineers' responsibility to perform, with a particularly heavy burden upon me.  (*See* Email from me to Mr. Richardson, dated December 27, 2009) (which is attached hereto as Exh. 26)).

2.) Processing of ACCs (Added):  On October or December 2009, Ms. Ladias distributed this responsibility to the Engineers/FMs.   This work had been coordinated and previously performed by Donica Davis.   (*See Id.*).

3.) ARRA (stimulus) Reviews (Added):  November 2009 (on-site and in-house:  this constitutes a great deal of work).  I complained about this, as well as about other assignments; because it was obvious that Ms. Ladias selected

24

the review assignments.  That is, the selections favored people she preferred, as opposed to employees who had filed EEO complaints.  The Housing Authorities (HA) site selections for these other employees were closer, and some of these employees, such as Belinda Francisco, did not have on-site views.  Also, the pairing of partners (FMs, Engineers and PHRS (Public Housing Revitalization Specialist) worked in pairs) was more favorable to employees that Ms. Ladias preferred. For example, I was paired with someone who had no procurement or construction background, and this employee did not drive. Also, the FMs and engineers were all told initially that each individual would be assigned four HAs, but Iwas assigned six, as a result of which I complained.  (*See* Exhibit 26 and Email from me to Mr. Richardson, dated November 20, 2009) (Exhibit 27)).  Additionally, the FMs and engineers were told that administration and work associated with these grants would be performed and handled by newly hired staff.  This did not happen.

4.) EH&S Project (Taken Away):  In February 2010, Mr. Richardson, after I had complained about my workload (*See* Exhibits 26 and 27), told me to train and turn over the EH&S (Exigent Health & Safety) Inspections portion of my workload to Dedric Patterson.  (EH&S work had become much easier, because all HAs, including the CHA, were finally certifying on line).

5.) Filing Budget Revisions (Added):  In July or August 2010, a requirement to file budget revisions was imposed by Ms. Ladias in a group meeting. This impacted me significantly, because I had twice as many

25

HAs as any other Facility Manager (FM) in the group.  (In 2009, I had 30 FM HAs assigned.  The next closest FM had 17HAs).  (*See* 2009 FM Assignment #HA) (Exh. 28)).  This resulted in numerous budget revisions, including the ARRA budget revisions.  I believe that the intent was to humiliate me, by assigning me, an engineer, the work of a clerk or program assistant.  Everyone in that room knew that Ms. Ladias was sending a message that she was still in charge of me, and Mr. Richardson, who was also there, said absolutely nothing.

6.) Direct Order:  EPC Training (Added):  On October 7, 2010, after I had turned down Mr. Richardson's invitation for me to perform Energy Performance Contract ("EPC") training because of my intense workload and lack of experience (I had never perform an EPC, and had only performed minimal work on HAs with existing EPCs), Mr. Richardson issued this direct order.  In his deposition, on January 13, 2011 (Exhibit 29) (p. 50, lns. 18-20)), Mr. Richardson was asked who made the decision for me to do EPC training.  Mr. Richardson answered:  "Mr. -- Steve.  Mr. Meiss."  Mr. Meiss is the Director of the PIH Department.  Mr. Richardson, in his second deposition, dated March 7, 2013 (Exh. 30), again stated (p. 3, lns. 19 -21) that Mr. Meiss made the decision:

Question (Fuchs): "Whose decision was it for Mr. Boss to do that training?"

Mr. Richardson:  "Mr. Meiss told me."  (*Id.*).

26

7.) Public Housing Utilization Project (Added):   On October 25, 2010, I had a meeting with Mr. Richardson to discuss my workload.  I was under the impression that some of my work and HAs would be transferred to the newly hired engineer (Zill Khan, September, 2010) in the group.  However, this did not happen.  Instead, Mr. Richardson stated that I would be added to this Public Housing Utilization Project:  this was not Engineering or FM work.  In contrast, when I  entered Defendant's employment, on September 22, 2002, I picked up, a mere seven days later, 12 HAs from the engineers/FM staff, in order to lighten Defendant's workload.  (*See* 2002 FM Assignment List) (Exh. 31)).  I had appealed to Mr. Richardson to reduce my workload, because I had been experiencing the same stresses and dizzy episodes that I had been having before the stroke in 2009.  I felt overwhelmed and hopelessly frustrated, in that my managers, in apparent retaliation, kept piling on the work, when I needed a decrease in work.  As a result, I was finding it difficult to cope.

8.) Chicago Housing Authority (CHA) Re-assigned (Added):  On October 27, 2009, Ms. Ladias sent Mr. Richardson an email reassigning the CHA to me. (*See* Email from Ms. Ladias to Mr. Richardson, dated October 27, 2009) (Exh. 32)).  Ms. Ladias previously assigned me Mr. Kobb's CHA work, and listed me as the lone FM responsible for the CHA on the 2008 FM Assignment list.  Ms. Ladias later took me off the list in 2009, presumably because of my EEO activity, in that my position on the list enabled me to obtain information, such as the latitude that Ms. Ladias had clearly given to Mr. Kobb, which Ms. Ladias did not want me to have.  Ms. Ladias instead listed Ms. Evans-Peterson & Dedric

Patterson.  HUD headquarters wanted all of those open grants of the CHA, when

they had been under Mr. Kobb, to be closed, and Ms. Ladias subsequently

directed Ms. Evans-Peterson and Mr. Spearman to meet with the CHA to close

out those open grants.  As a consequence, Ms. Ladias completely removed me,

ending all my previous contact with the CHA.  This reassignment was never

officially made known to me, until I started reviewing the Defendant's discovery

documents.  Since taking away this assignment constituted a 180-degree

reversal on Ms. Ladias' part, the only explanation is Ms. Ladias' knowledge that I

had filed my second EEOC  Complaint.  Thus, the reassignment was never

officially announced.  Ms. Ladias' about-face concurrently illustrates the extent to

which she was dictating to, and communicating with, Mr. Richardson with respect

to my work assignments; and confirms that Mr. Richardson was less than

forthright  during his deposition of January 13, 2011 (Exh. 29) (p. 65, ln. 19 – p.

66, ln. 1)) :

> Question (Fuchs):  "After Ms. Ladias was no longer
>
> supervising Mr. Boss, did you ever get any assignments
>
> from Ms. Ladias concerning Mr. Boss?"
>
> Mr. Richardson:  "No." (*Id.*).

Dr. Fajardo noted that, based upon his observation of me, Mr. Richardson appears to

have increased Mr. Boss' workload, in planning and consultation with Ms. Ladias.  (Exh.

1, par. 13).  Thus, although Ms. Ladias finally reassigned the CHA, because she did not

want me to have knowledge that would demonstrate her disparate treatment of me, vis-

à-vis her treatment of Mr. Kobb, she nonetheless assured, in dictating to Mr.

Richardson, that I would still have an overly onerous workload.

71. The EPC (Energy Performance Contracts) Direct Order from Mr. Richardson
was in direct violation of my job Position Description.   As is stated in the Position
Description for a General Engineer, GS-0801-13,  this position " [t]rains lower-
graded engineering and facilities management staff."  (*See* Affidavit B, p. 81)
(Exh. 33)).  Instead, Mr. Richardson was directing me to train individuals whose
grading  and steps were higher than mine (who were at a 13, 14, & 15 level, in
that they had arrived at HUD prior to my arrival in September, 2002), as well as
staff who are not engineers or facilities managers.  Worse, I did not feel qualified
to perform EPC training, and do not believe that  a few hours of training qualifies
an employee to train with respect to a subject that involves so many disciplines
(engineering, legal, finance, and economics) .  Additionally, I had never
performed or implemented an EPC anywhere.  I was accordingly highly
uncomfortable with the prospect of discussing a subject with which I rarely dealt,
and concerning which hands-on experience and knowledge would be necessary
for training purposes. (In 2009, only two (2) of the thirty (30) HAs assigned to me
had an EPC (Joliet and Elgin).  Both were existing EPCs, so this involved very
minimal work; in that the EPCs were in place, when the HAs were assigned to
me.  (*See* Email from Leigh Schrock to Mr. Spearman and me, dated March 25,
2008 (concerning EPC Data for PIH ) (Exh. 34)).  Moreover, with respect to
training, *all of the staff in PIH, in some capacity, have had some training in EPC*,
so the claim that I could provide training, because I had had training, is

29

meaningless.  Further, the training that was already available was adequate. HUD has up-to-date HUD web-based training, including procedures manuals with samples, as ell as EPC expert trainers (who are available through HUD). NAHRO also offers training, and Nan McKay offers EPC training.  (Training is needed every time that an employee has work involving EPC, because the rules, regulations, etc., change all the time).  In fact, only one month before I was given this Direct Order, the PIH Department had to attend mandatory Energy Performance Training.  (*See* group email from Mr. Meiss, dated  September 20, 2010) (Exhibit 35)).  Thus, in PIH, there have been many individuals who have had EPC training and experience, and some who have actually implemented an EPC.  (S*ee* Exh. 34).  It should be noted that HUD employees Mansel Freeman and Mary Polk, each of whom is an FA, worked with Joliet in implementing an EPC, and are still in PIH.  These individuals are more qualified than me, and their experience, along with supporting performance data, would be more appreciated and accepted, from the standpoint of employees taking training.  Training knowledge alone does not distinguish an employee as an expert.  Rather, the determining factors are actual knowledge, experience, and implementation of an EPC, which respect to what makes an employee a specialist who can train others.  As Mr. Richardson admitted, Mr. Richardson's directive that I conduct the training emanated from Mr. Meiss.  (Exhs. 29 & 30). Mr. Meiss had been named as a Responsible Management Official in my EEO Complaint, and it would appear that his instruction to Mr. Richardson had nothing to do with my experience with EPC or my position as an engineer.  Mr. Meiss'

30

motive was to continue the retaliation, increase my workload, and maintain the hostile work environment. *Chester Piontek, a Caucasian engineer (retired), coordinated and implemented EPC for years in PIH, and he never performed any EPC training. Also, because of my illness, the EPC training was performed By Ted Termunde (Attorney -GS-14 or 15 ) and Joe Nemedi (FA - GS-13 or 14). Both have EPC experience.*

72. I was out on extended sick leave, as the advice of my psychiatrist, Dr. Fajardo, who consulted with my other physicians.

73. As a result of the harassment, which had so irreparably affected his health, I left Federal service far earlier than I had intended.

74. Defendant failed to comply, in even the most basic way, with the AJ's Order. Defendant even failed to comply with the AJ's Order that the Agency provide EEO training within 90 Day. (Dkt. #42, ID ##457-458). Rather, Defendant waited until six months, after I had filed a second EEO Complaint.

75. Defendant also refused to transfer me, as recommended by the AJ, and Defendant attempted to justify Defendant's refusal by claiming that HUD was phasing out engineers. Yet, during this time frame, HUD hired two engineers in HUD's Special Application Center, which was located on the same floor as HUD's PIH Offices, where I had been working: Alex Nasser in 2009 and Nartik Patel in 2008. Further, in September, 2010, HUD hired a new engineer in PIH, Zill Khan. Moreover, when I went out on disability, three more Engineers/FMs were hired in PIH. They were Erik Sandstedt, Travis Saunders, and Michael Siry. HUD's claim that HUD was phasing out engineers was therefore false.

76. In contrast to me, Defendant allowed Rebecca Taylor, a Financial Analyst in my Group, who is White, and who had difficulties with Ms. Ladias, to transfer.

77. With respect to leave issues, Ms. Ladias, who subjected my requests for leave to close scrutiny, placed Mr. Spearman, who had not engaged in prior EEO activity, but who had been ill, on telework five days per week.

78. In further retaliation, my managers were attempting to set me up as a fall guy, by attempting to force me to falsify information. No other employee, to my knowledge, was asked to do this.

79. Mr. Meiss had also harassed another EEO complainant, Gilbert Galinato, with respect to time and attendance issues. (*See* Dkt. #40-2, ID #399, pp. 106-107.

80. When I spoke to the EEO counselor, in my first case, I explained that Ms. Ladias had held me to a disparate standard of performance, had disparaged my work, and had created a hostile work environment. I also explained that my departure from a site review was not early. I had completed his work, and I had traveled to the review on a Sunday. As a consequence, my departure was not early.

81. Ms. Ladias, in an admonishing email to me concerning telework, did not direct me to follow telework requirements, but, rather, claimed falsely that I had not.

82. With respect to the Ladias/Garcia close-out project, the FM staff did not take said project very seriously, because it was fairly evident that neither Ms. Ladias nor Ms. Garcia had any experience in closing out CFP grants or performing engineering/FM work. Their dates for closing out a grant were unrealistic. At times, it takes almost one year to get an accountant to audit a grant program.

83. Concerning Defendant's disparate treatment of me, it is also noteworthy that, as

32

of May, 2007, Mr. Kobb, who had 25 years of experience, had two more close-outs to perform; and I had inherited the bulk of my close-outs. Also, I had numerous on-site reviews.

I have read the forgoing Affidavit consisting of thirty-three (33) page(s), and I hereby attest under penalty of perjury that it is true and correct to the best of my knowledge and belief. I have signed or initialed each page. I have been given the opportunity to make any corrections and/or additions, which I have submitted.

*Larry A. Boss*        10/21/2013

LARRY BOSS                Date

33