# EXHIBIT #10

**Ladias, Eleny**                                   **January 12, 2011**

Page 1

UNITED STATES OF AMERICA

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

MILWAUKEE DISTRICT OFFICE


- - - - - - - - - - - - - - - x

LARRY BOSS                          : EEOC NUMBER:

      Complainant                 : 443-08-00115X

        vs                        : AGENCY NUMBER:

ALPHONSO JACKSON, SECRETARY    : HUD 00123 2007

DEPARTMENT OF HOUSING &          :

URBAN DEVELOPMENT                  :

      Agency                      :

- - - - - - - - - - - - - - x January 12, 2011


        PURSUANT TO NOTICE, the following

deposition of ELENY LADIAS was taken via telephone

by me, Kathleen S. Wilson, Notary Public, in and

for the State of Maryland, at 440 West Randolph

Street, Chicago, Illinois 60606, commencing at

1:25 p.m., when were present on behalf of the

respective parties:

**Elite Reporting Company, Inc.**                     **800-734-3337**
**67 Saint Andrews Road**        Severna Park,        **Maryland 21146**

Ladias, Eleny                          January 12, 2011

                                                    Page 2

1    APPEARANCES

2

3         JAMES L. FUCHS, ESQUIRE

4         Snider and Associates, LLC

5         104 Church Lane

6         Suite 100

7         Baltimore, Maryland 21208

8         (410) 653-9060

9              On Behalf Of The Complainant

10

11        THOMAS G. MASSOURAS, ESQUIRE (Via Telephone)

12        U.S. Department of Housing and

13          Urban Development

14        Office of the Regional Counsel

15        77 West Jackson Boulevard

16        Room 2622

17        Chicago, Illinois 60604

18        (312) 913-8649

19              On Behalf of the Agency

20

21   ALSO PRESENT - Larry Boss

Elite Reporting Company, Inc.                    800-734-3337
67 Saint Andrews Road          Severna Park,      Maryland 21146

Ladias, Eleny                                      January 12, 2011



Page 3

1                              I-N-D-E-X

2

3    WITNESS

4    ELENY LADIAS

5    Examination by Mr. Fuchs                        Page 5

6

7

8

9                         E-X-H-I-B-I-T-S

10                            (None)

11

12

13

14

15

16

17

18

19

20

21

Ladias, Eleny                                    January 12, 2011

1    Whereupon,

2                          ELENY LADIAS,

3    was called as a witness by counsel for the

4    Complainant, Larry Boss, and after having first

5    been duly sworn by the Notary Reporter, was

6    examined and testified as follows:

7              THE REPORTER:  Would you state your full

8    name and address for the record?   And you can

9    give me your work address is fine.

10             THE WITNESS:  It's Eleny Ladias, 77 West

11   Jackson, Chicago, Illinois 60604.

12             THE REPORTER:   Thank you.

13                          EXAMINATION

14        BY MR. FUCHS:

15        Q.   Ms. Ladias, good afternoon.

16        A.   Hello.

17        Q.   My name is James Fuchs and, as I think

18   you know, I'm representing Larry Boss in his

19   action against the agency.

20             I'm going to be asking you a series of

21   questions in what is known as a deposition.  I

**Ladias, Eleny**                                    **January 12, 2011**

1       Q.    Which housing assignments were difficult

2    for Mr. Spearman?

3       A.    East St. Louis, Lackford, Springfield,

4    Rock Island.

5       Q.    What was difficult about -- I'm sorry.

6    Had you finished?

7       A.    Williamson County.

8       Q.    Why were those assignments difficult?

9       A.    Those housing authorities are either

10   troubled or they require extensive technical

11   assistance due to staff turnover, issues at the

12   housing authority, many tenant complaints.

13      Q.    What kind of technical assistance would

14   they require?

15      A.    Usually in the capital fund area because

16   they would lose staff who were trained and then

17   Bill would have to assist them in the capital fund

18   obligations and expenditures.

19      Q.    How would he assist them with the capital

20   fund expenditures?

21      A.    In some cases he had the housing

Ladias, Eleny                                    January 12, 2011

Page 24

1        Q.    Now, you mentioned -- you testified that

2   Mr. Kobb had 50 open -- had 50 that were open.

3   Did he -- did Mr. Kobb have particularly difficult

4   housing authorities to work with?

5        A.    He had a few troubled housing

6   authorities.  I met with Mr. Kobb right after the

7   listing was generated and within two months of our

8   meeting, he closed roughly 32 open grants of the

9   50 that he had.

10             By April of 2008, he had completed all of

11   them except for roughly ten.  And he had worked on

12   the 2003 because he provided me with a listing and

13   he knew he was retiring in July of 2008.

14        Q.    Do you know whether he did everything he

15   needed to do in order to make those closeouts

16   correct?

17        A.    Yes.  Yes.  He was very diligent, once I

18   met with him.

19        Q.    Was this something you observed or

20   something that you surmised?

21        A.    My observation was that he was diligent

Ladias, Eleny                                    January 12, 2011

Page 46

1          A.    With the special project, most of the

2     grants that were older were closed out.

3          Q.    By the engineers or by someone else?

4          A.    The engineers closed out the majority of

5     the old programs.  And then when some of them

6     retired, I reassigned the housing authorities to

7     the financial staff and now they are conducting

8     closeouts.

9          Q.    Who are the financial staff are

10    conducting closeouts?

11         A.    Cheryl Evans-Petterson.  Donica Davis.

12    Belinda Francisco doesn't have proper access to

13    eLOCCS.  And Mansel doesn't either.  So the

14    majority -- and Joe Nemedi.  He is also doing

15    these closeouts.  The rest of them are being

16    completed by a program assistant, Alease Thomas.

17         Q.    Anyone else?

18         A.    That's it.

19         Q.    Mansel is Mansel Freeman?

20         A.    Freeman.

21         Q.    Freeman.  Was Mr. Freeman?

**Ladias, Eleny**                    **January 12, 2011**

1      Q.    Can you break down the distribution?

2      A.    I don't recall.  I do know that Mr. --

3    Mr. Boss had CHA and Cook County.  He did receive

4    Cook County from Larry Kobb.

5      Q.    Were CHA and Cook County more difficult,

6    less difficult, about the same in difficulty as

7    other housing authorities?

8      A.    Cook County was a large housing

9    authority.  CHA is a moving to work housing

10   authority.

11     Q.    Moving to work, you said?

12     A.    Moving to work.

13     Q.    Can you explain that?

14     A.    They are not -- being a moving to work

15   housing authority means that they have flexibility

16   in HUD rules and regulations.

17         For example, they're not required to

18   submit a PHA plan to our office.  And for a long

19   time they were not required to close out their

20   capital fund grants.

21         Also, they didn't have to update their

**Ladias, Eleny**                         **January 12, 2011**

1  obligations and expenditures in LOCCS until the

2  MTW Agreement was changed in early -- in early

3  Fiscal Year -- at the end of 2008, early 2009.

4       Q.    How was it that this change took place?

5       A.    It was an agreement in headquarters.

6  Headquarters maintains those agreements.

7       Q.    Was someone in headquarters in particular

8  interested in that change, as far as you know?  If

9  you don't know, that's fine.

10      A.    I don't know.

11      Q.    Okay.  And when you said that there was

12  flexibility, can you explain that?

13      A.    Most housing authorities have to keep

14  their capital funds money for capital fund items.

15  Their operating subsidy money for operating

16  subsidies, general expenses.  Section 8 moneys

17  have to be used for Section 8 purposes.

18           But CHA is allowed to commingle their

19  funds and so they can use their Section 8 funding

20  for capital fund items, as long as they are able

21  to account for the items they are spending the

Elite Reporting Company, Inc.              800-734-3337
67 Saint Andrews Road        Severna Park,    Maryland 21146

Ladias, Eleny                          January 12, 2011

1      Q.    Okay.   And is there any way of parceling

2   that housing authority or do you have to give the

3   whole housing authority to someone?

4      A.    It's easier to keep that recording

5   straight to assign housing authorities at Cook

6   County to one person, to make them the lead, so to

7   speak.

8      Q.    So, when Mr. Boss had CHA, and I

9   understand Cook County which he inherited from Mr.

10  Kobb, did he have more housing authorities than

11  anyone else, or more work with respect to housing

12  authorities than anyone else?

13     A.    As compared to?

14     Q.    Other engineers or financial managers.

15     A.    When Mr. Kobb retired, it was Mr.

16  Spearman and Mr. Boss remaining as engineers.

17           William Spearman, at that time, had a

18  couple housing authorities more than Larry --

19  Larry Boss.   But his housing authorities were the

20  complex housing authorities, were the troubled

21  housing authorities.

Ladias, Eleny                                      January 12, 2011

                                                        Page 56

1    schedule.  And the housing authority is scored

2    based on that information.

3            For REAC, the REAC Assessment Center goes

4    out and they do annual inspections of units, a

5    certain percentage of the units of the housing

6    authorities, and they score the housing

7    authorities based on those inspections.

8        Q.    Is it harder to deal with a troubled

9    housing authority than a non-troubled one?

10       A.    Yes.

11       Q.    What kinds of added responsibilities

12   would there be?

13       A.    When a housing authority is considered

14   troubled, a memorandum of agreement is entered

15   into with the housing authority and they are

16   required to submit to us monthly reporting of

17   progress.

18       Q.    The housing authority is required?

19       A.    The housing authority.

20       Q.    And how does this affect the engineer's

21   workload?

Ladias, Eleny                           January 12, 2011

Page 57

1       A.    Intensive technical assistance is

2    required to assist the housing authority and to go

3    over the items they are deficient in and to make

4    sure that they are making progress.

5       Q.    Do you know for a fact that Mr. Spearman

6    was doing this?

7       A.    Yes.

8       Q.    How do you know that?

9       A.    He had a couple of troubled housing

10   authorities.

11      Q.    And so how do you know he was doing the

12   extra legwork that you have described?

13      A.    By his reports, meetings he was having

14   with housing authorities, communications, e-mail

15   communications.  He testified for Williamson

16   County Housing Authority.

17      Q.    Were these --

18      A.    He went and did special on-site visits.

19   He visited Springfield Housing Authority.

20      Q.    Were these reports required or were they

21   something he simply did, Mr. Spearman?  You

Ladias, Eleny                           January 12, 2011

                                             Page 66

1        A.    Yes.   All of the staff received the

2    housing authority assignments after Larry Kobb had

3    retired in July of 2008.  I supplied a listing to

4    all staff in August of 2008 of all the housing

5    authority assignments.

6             In addition, we had a staff meeting and

7    we discussed them and I asked the staff if they

8    were okay with the housing authority assignments.

9             I had no -- Mr. Boss did not voice any

10   objections at the time.

11       Q.    And he was at that meeting?

12       A.    I don't recall.

13       Q.    Did you do anything to ensure that

14   everybody would be at the meeting?

15       A.    I don't recall.

16       Q.    Did you take steps to inform anyone who

17   wasn't at the meeting what had transpired at the

18   meeting?

19       A.    I don't recall.

20       Q.    Was there more than one meeting about

21   this?

Ladias, Eleny                                    January 12, 2011

Page 74

1    meeting and told her we need additional engineers.

2         Q.   What were the circumstances under which

3    you had that meeting?

4         A.   She had just come into our office to

5    visit and at that time I expressed the fact that

6    we needed additional engineers.

7         Q.   Did she respond to you?

8         A.   Yes.

9         Q.   What did she say?

10        A.   We probably will be able to hire one or

11   two engineers in the near future.

12        Q.   And -- but she didn't do that?

13        A.   My conversation with her was last year

14   sometime, so we did -- we were able to hire an

15   engineer in September of 2009.  So whether it was

16   her that was -- that prompted that -- or 2010.

17   I'm sorry.  We hired the engineer in 2010.

18   September 2010.  So I'm not sure whether she was

19   the individual that -- that was able to get those

20   positions or not.

21        Q.   How long a time had elapsed from the time

Ladias, Eleny                                    January 12, 2011

Page 96

1      -- our reviews don't require the engineering
2      discipline.
3           Q.    Now before his death were there also --
4      were there not enough engineers available?
5           A.    It was difficult because we had lost a
6      lot of engineers.  However, Bill Spearman did do
7      six on-site reviews in 2009 and Larry did one.
8           Q.    How many did Mr. Spearman do?
9           A.    Six.
10          Q.    And Mr. Boss did one?
11          A.    One.
12          Q.    What was the complexity of the ones Mr.
13     Spearman did?
14          A.    He did Peoria, CHA, Springfield, and I
15     can't remember what the others were.  They were --
16     you know, and they are difficult housing
17     authorities.
18          Q.    How about the complexity of the one that
19     Mr. Boss did?
20          A.    I can't remember which one that was.  It
21     -- I don't remember.

Elite Reporting Company, Inc.                    800-734-3337
67 Saint Andrews Road              Severna Park,     Maryland 21146

Ladias, Eleny                              January 12, 2011

                                                      Page 98

1        A.    Yes.

2        Q.    In terms of getting compliance and the

3   like?

4        A.    Yes.

5        Q.    Before Mr. Boss went out sick, did Mr.

6   Spearman say that Mr. Boss should take up some of

7   the slack?

8        A.    I don't recall.

9        Q.    Before Mr. Boss went out sick, did you

10  suggest that he should take up some of the slack?

11       A.    I don't recall.

12       Q.    All right.  Now -- all right.  Now, you

13  mentioned that -- you testified that there was --

14  I'm sorry.  Let's go back then.

15             HOPE VI reviews, was it necessary to have

16  an engineer for those?

17       A.    Yes.

18       Q.    Why for the HOPE VI?

19       A.    Because they needed to -- the engineer

20  needed to look at the contract award.  The

21  engineer needed to look at inspections.  The

Ladias, Eleny                                January 12, 2011

Page 141

1        Q.    Did Mr. Panagos have any housing

2    authorities?

3        A.    Yes.

4        Q.    Did these housing authorities have open

5    programs?

6        A.    Yes.

7        Q.    Why were they open?

8        A.    Like all the other engineers, there were

9    a number of open grants that hadn't been closed

10   out.  However, he retired before the special

11   project was undertaken in early 2007.  In fact, he

12   retired, I believe, in February of 2007 and we

13   started the special project in March of 2007.

14       Q.    All right.  Do you know if Mr. Panagos

15   had access to -- project control systems?

16       A.    He did not.

17       Q.    Do you know if this was a requirement for

18   the job?

19       A.    He was not considered an engineer.  His

20   background was not in engineering.  So -- and he

21   was unable to get the security clearance required

Ladias, Eleny                          January 12, 2011

1    for LOCCS access.  He was an employee that was

2    transferred from the Troubled Agency Recovery

3    Center into our office, and we basically inherited

4    some employees, and he did not have access.

5         Q.    Did Mr. Boss ever express concern about

6    inheriting Mr. Kobb's CHA work?

7         A.    Mr. Kobb's?

8         Q.    Mr. Boss ever -- did Mr. Boss express

9    concern about inheriting Mr. Kobb's CHA work?

10        A.    I don't recall.

11        Q.    Was a decision made to assign Mr. Boss

12   some of Mr. Kobb's CHA work?

13        A.    Mr. -- Mr. Boss and Mr. Kobb were jointly

14   assigned to CHA, as early as 2007.  If you look at

15   the assignment listing, they were both -- both

16   assigned to CHA.  And they were basically

17   splitting up the function.  And when Larry Kobb

18   retired, then Larry Boss became the FM contact.

19        Q.    Could anyone else have shared that

20   responsibility with Mr. Boss?

21        A.    Mr. Spearman was actually sharing the

Ladias, Eleny                                    January 12, 2011

Page 150

1    not get into eLOCCS, that he had not taken his HUD
2    laptop computer home that day and he was working
3    with -- from his personal computer.

4            The requirement is that if a HUD employee
5    is going to tele-work, they have to have access to
6    all HUD systems.  So if you don't take your HUD
7    laptop home and you are working off your personal
8    computer, then you need to have access to HUD
9    Mobile.

10           I am not a tele-worker and I have access
11   to HUD Mobile, and I have access to all HUD
12   systems.  And he demonstrated that he did not have
13   access to the systems.

14      Q.   Now, when you say that it's required that
15   someone have access to -- for all tele-workers to
16   have access to all systems --

17      A.   Right.

18      Q.   -- where is that required?

19      A.   In the tele-work agreement.

20      Q.   Okay.  Who determines the dates of CHA
21   reviews?

Ladias, Eleny                          January 12, 2011

1        A.    The review schedule is usually -- we sit

2    down -- Elmore, Steve, and I -- and we go over the

3    number of reviews that headquarters has told us

4    that we have to do, or we have to complete for the

5    year.  And that at that point, we look to see

6    which housing authorities should be which quarter,

7    you know, what -- what dates the housing authority

8    -- excuse me.  We determine the months that the

9    reviews should take place.  However, it is not set

10   in stone.  We communicate to the staff what the

11   review schedule is, who is on the team, and we

12   leave it pretty much up to the staff to decide the

13   exact dates, based on their schedules.

14            So the review schedule that is put in

15   place at the beginning of the year is not set in

16   stone.  It's subject to change.

17       Q.    Does a team member have a role in

18   determining this?

19       A.    Yes.  All team members should have -- it

20   should be a consensus of the team.  And that's how

21   it works.

Ladias, Eleny                                    January 12, 2011

                                                         Page 152

1          Q.    Who picks the team members?

2          A.    Steve, Elmore, and me.

3          Q.    How are they picked?

4          A.    Based on the level of expertise, how many

5    reviews the employee has, that's how we decide.

6          Q.    Do you know how many reviews Mr. Boss had

7    for the Year 2008?

8          A.    No.  I don't recall.

9          Q.    Do you remember if he completed those

10   reviews?

11         A.    I don't recall.  I know that he did not

12   complete the HOPE VI on-site review for 2008.

13   That's the only one, the CHA one, that I am aware

14   of.

15         Q.    By the way, who -- who was involved in

16   the determination that Mr. Boss would be involved

17   in that HOPE VI review?

18         A.    We had no other facility engineer to

19   attend the review, so we needed to have Mr. Boss

20   attend it.  We had no other -- Bill was out.  Bill

21   had had an accident.

Ladias, Eleny                                    January 12, 2011

Page 153

1        Q.   Was this a discussion between you and Mr.

2   Meiss, or you and someone else, or it was your own

3   decision?

4        A.   No.   It was a discussion with Elmore, me,

5   and Steve.

6        Q.   Okay.   Did headquarters send e-mails to

7   your office concerning non-compliance?

8        A.   Clarify.

9        Q.   Non-compliance with closeout reviews.

10       A.   We didn't --

11       Q.   Right.

12       A.   I don't understand the question.

13       Q.   Did headquarters ever say that you had

14   not -- that your office had been deficient in

15   compliance with anything in an e-mail?

16       A.   No.

17       Q.   All right.   And you testified that Mr.

18   Panagos did not have access to the LOCCS;  is that

19   correct?

20       A.   Right.   Yes.

21       Q.   Do you have access to it?

Ladias, Eleny                                    January 12, 2011

Page 154

1        A.    I have query access.  I do not have full

2    access.

3        Q.    Is it necessary to be an engineer to have

4    full access?

5        A.    Yes.

6        Q.    Was CHA required to close out any grants

7    before 2009?

8        A.    No.

9        Q.    Did you ever contact anyone in tele-work

10   who was not available?  In other words, try to --

11   did you ever try to contact someone who was

12   supposed to be tele-working and find that person

13   was not available?

14       A.    Clarify.

15       Q.    Did you ever try to -- let's say Tuesday

16   was Jane Smith's tele-work day.  Did you ever try

17   to -- was there ever a time that you tried to

18   contact Jane Smith or anybody else on a tele-

19   working day and find that the employee was not

20   there?

21       A.    Yes.

Ladias, Eleny                                    January 12, 2011

Page 166

1          Q.    Had she spoken to you about this before

2    that or not?

3          A.    The assignment listing was clear.

4          Q.    Since CHA is a fairly large entity, is

5    there any reason to assume that Mr. Boss would be

6    handling the entire thing?

7          A.    Cheryl Evans-Petterson is a financial

8    analyst and she is doing the facilities management

9    portion right now.  She is currently doing both

10   the financial and the facilities part.  So if it

11   can be assigned to Cheryl Evans-Petterson and she

12   could do a good job of it, I believed that Larry

13   would have been able to handle CHA by himself.

14         Q.    So does this mean that non-engineers can

15   do engineering work?

16         A.    Remember, they are not doing certain

17   things -- ETC contracts.  There are certain things

18   that facilities engineers do.

19               Right now, because there is just a few

20   things that CHA has to -- is required to do, she

21   can handle it.